LAMBERT, J.
Following a jury trial, Gangapersad Ramroop (“Ramroop”) was convicted of first-degree murder, attempted second-degree murder, and knowingly discharging a firearm from a vehicle within 1000 feet of a person. On appeal, he argues that the State’s closing argument was improper and constituted fundamental error and that the trial court erred by admitting an inflammatory photograph into evidence. In addition, as to his conviction for attempted second-degree murder, he argues that the jury instruction pertaining to the jury’s special finding that the victim was a law enforcement officer engaged in the performance of his duties at the time of the offense failed to also require the jury to find that Ramroop had knowledge of the victim’s status. We agree that error was committed on all three grounds. However, we find only the last error to be *587 reversible, and only as it affects Ram-roop’s sentence for attempted second-degree murder.
During the early morning hours of July 4, 2013, several officers of the Orlando Police Department attempted to pull over Ramroop’s vehicle for a traffic violation. A chase ensued, whereupon Ramroop ran several red lights, and allegedly shot at one of the officers involved in the pursuit, Officer Christopher Brillant. Ramroop ultimately struck another vehicle in an intersection, causing the death of the driver of that vehicle, Robert Charles John Hunter. Hunter was not wearing a seatbelt at the time of the crash, and his body was ejected from the vehicle onto the pavement. Ram-roop was apprehended at the scene of the crash and subsequently charged by information with (1) attempted first-degree murder of an officer engaged in the lawful performance of a legal duty and (2) knowingly discharging a firearm from a vehicle within 1000 feet of a person. Ramroop was also separately indicted for first-degree murder of Hunter.
At trial, the State and Ramroop entered into two stipulations pertaining to the death of Hunter. The first stipulation stated as follows:
The State and Defense have entered into the following joint stipulation regarding the location of impact between the vehicles being driven by Gangaper-sad Ramroop and Robert Charles John Hunter. The front of Gangapersad Ramroop’s vehicle struck the driver’s side of the vehicle driven by Robert Charles John Hunter. This is the only area of impact between Gangapersad Ramroop’s vehicle and Robert Charles John Hunter’s vehicle.
The second stipulation stated:
The State and Defense have entered into the following joint stipulation regarding the identity of the deceased, the cause of death, and the result of the traffic investigation. On July 4, 2013, Gangapersad Ramroop ran a red light at the intersection of State Road 50 (Colonial Drive) and Powers Drive and struck a vehicle driven by Robert Charles John Hunter, a 25 year old black male. Robert Charles John Hunter died as a result of injuries sustained during the crash after being ejected from his vehicle onto the sidewalk next to the roadway. The official cause of death by the medical examiner is blunt craniocerebral injuries (trauma to both the skull and brain). The Florida Highway Patrol investigated this crash and determined neither driver was wearing a seat belt at the time of the crash, and that front and side curtain airbags did deploy in Robert Charles John Hunter’s vehicle. Gangapersad Ramroop violated the right of way of Robert Charles John Hunter’s vehicle and was faulted for the crash as a result of the Florida Highway Patrol investigation; speed and alcohol/drugs were not factors in the crash.
Both stipulations were read to the jury.
Notwithstanding the aforementioned stipulations, the State offered into evidence a graphic photograph of Hunter’s body on the pavement of the intersection where the crash occurred. The photograph depicted Hunter’s body covered in scrapes and wounds with his pants around his knees and Hunter’s head resting in a stagnant pool of blood. The photograph did not show Hunter’s body in relation to either Hunter’s or Ramroop’s vehicle or the surrounding intersection; it was merely a still image focused on Hunter’s lifeless body.
Ramroop immediately objected to the admission of the photograph. During a sidebar conference, Ramroop argued that the photograph was unnecessary due to the stipulations and would only serve to *588 inflame the jury. The prosecutor responded that the photograph “shows how the victim’s body was found after the crash and it shows tire marks on his body,” that it was the only photograph he was showing of the victim, and that he “need[ed] to show how [Hunter] was left.” The trial court acknowledged that the photograph showed “a good amount of blood” and even stated that it wished the photograph had less blood, but nevertheless overruled Ramroop’s objection.
The primary issue at trial was whether Ramroop shot at Officer Brillant in the course of the pursuit.[1] Ramroop testified at trial admitting practically everything except whether he shot at Officer Brillant. According to Ramroop, he fired his gun “[i]nto the area ... [b]ecause that’s what we do — like celebrating July 4th and New Years and stuff like that. I grew up around stuff like that.” Ramroop stated that he did not see any people or cars around when he was firing his gun and that he was not trying to shoot at Officer Brillant on July 4th, 2013.
At the conclusion of trial, Ramroop was found guilty of first-degree murder of Hunter, guilty of the lesser-ineluded offense of attempted second-degree murder of Officer Brillant, and guilty of discharging a firearm from a vehicle within 1000 feet of a person. In addition, the jury made a special finding that during the course of the commission of the attempted second-degree murder, Officer Brillant was a police officer for the city of Orlando engaged in the lawful execution of his legal duties. Ramroop was sentenced the same day to two life sentences for the first-degree murder and attempted second-degree murder convictions. For the discharge of a firearm conviction, he was sentenced to fifteen years in prison. All sentences were to run concurrently.
I. The Prosecutor’s Comments during Closing Argument
Ramroop makes several arguments concerning the prosecutor’s closing argument. However, because Ramroop did not object to many of the allegedly improper comments discussed below, save two, the standard of review is fundamental error. See Brinson v. State, 153 So.3d 972, 975 (Fla. 5th DCA 2015) (citing Thomas v. State, 748 So.2d 970, 985 n. 10 (Fla.1999)). Moreover, only one of those arguments merits discussion.
Ramroop argues that the prosecutor engaged in demeaning personal attacks on defense counsel and disparaged his theory of defense. “A prosecutor may not ridicule a defendant or his theory of defense.” [2] Servis v. State, 855 So.2d 1190, 1194 (Fla. 5th DCA 2003) (citing Riley v. State, 560 So.2d 279, 280 (Fla. 3d DCA 1990)); see also Davis v. State, 136 So.3d 1169, 1203 (Fla.2014). Ramroop points to several comments made by the prosecutor, arguing that the prosecutor “used excessive sarcasm and disparaged defense counsel and defense theory throughout closing argument.” According to the prosecutor, Ramroop’s testimony that he did not intend to shoot at Officer Brillant was incon *589 sistent with a key piece of evidence at trial: the fact that a bullet was lodged in the passenger doorframe of Ramroop’s vehicle. Ramroop specifically testified that he did not know how the bullet became lodged in his vehicle. However, a crime scene technician testified that Ramroop’s gun went off when he crashed into Hunter’s vehicle, passing through the windshield. During closing argument, Ram-roop’s counsel argued that it was possible, contrary to the prosecutor’s version of events, that the bullet “could have ricocheted, and as the car is spinning[,] lodged in that door.”
In open court, the prosecutor analogized the defense’s theory to a “magic loogie” story in the sitcom, Seinfeld, stating that the theory that the bullet “for some reason [ ] turns in midair and spins around ... makes about as much sense — that makes about as much sense as Mr. Ramroop’s story.”[3] Further, during his rebuttal closing argument, the prosecutor even apologized for his sarcasm and implied that Ramroop’s “story” is “so fictional” that it makes it hard for him to hold back the sarcasm.- In addition, without objection, the prosecutor stated that Ramroop’s theory of defense was “absolutely ludicrous” and “incredible.” Lastly, the prosecutor questioned defense counsel’s candor and integrity by stating, “You know, [Defense] Counsel has to argue, what she has and that’s what she has.” Ramroop objected to that comment and the objection was overruled. The prosecutor continued his argument by stating, “As I was saying, defense counsel has to make the best argument she can based on what she’s given. And she’s done her job and that’s what she’s here to do.”
Taken together, these comments undoubtedly served to belittle, sarcastically or otherwise, Ramroop’s theory of defense and Ramroop’s counsel. The prosecutor admitted as much during a bench conference when he evidenced his belief that he could properly disparage the defense, stating, “I have every right to disparage the defense. I have every right to disparage the credibility of the defendant’s story.... And I am disparaging this defense and this defendant’s testimony and I have every right to.” As stated above, the prosecutor also acknowledged his sarcasm to the jury. Similar to Servís, where we reversed the defendant’s conviction based on the cumulative effect of the prosecutor’s improper comments during closing argument, we find that the prosecutor’s comments here improperly ridiculed Ramroop’s theory of defense and his defense counsel. See 855 So.2d at 1194 (finding that “the state’s comments resulted in an impermissible attack on the defense theory and defense counsel” (citing D'Ambrosio v. State, 786 So.2d 44 (Fla. 5th DCA 1999))); see also Crew v. State, 146 So.3d 101, 110 (Fla. 5th DCA 2014) (admonishing the prosecutor for “needlessly referring] to the defense attorney’s closing argument with sarcasm”).
As we do not find merit to any of Ramroop’s additional arguments concerning the prosecutor’s remarks during closing argument, we now .address whether the prosecutor’s disparagement of defense counsel and Ramroop’s theory of defense amounted to fundamental error. “In order for an error to be fundamental and justify reversal in the absence of a timely objection, ‘the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been *590 obtained without the assistance of the alleged error.’ ” Randolph v. State, 853 So.2d 1051, 1068 (Fla.2003) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). “In order to determine whether improper remarks constitute reversible error, they should be reviewed within the context of the closing argument as a whole and considered cumulatively within the context of the entire record.” See Brinson, 153 So.3d at 980 (quoting McArthur v. State, 801 So.2d 1037, 1040 (Fla. 5th DCA 2001)).
In this casé, Ramroop testified at trial. Though he argued that Hunter’s death was the result of an accident rather than occurring during the commission of a felony, Ramroop agreed with the evidence in the State’s case, except he specifically denied shooting at Officer Brillant. However, Officer Brillant also testified at trial and described with specificity how Ramroop shot at him. In addition, the prosecutor played a video of the encounter. Therefore, although we are troubled by the prosecutor’s improper comments, we find that the comments — when viewed in the context of the entire record — did not rise to the level of fundamental error so as to deny Ramroop a fair trial.
II. The Admission of the Photograph
Ramroop argues that the trial court erred in admitting the photograph of Hunter’s body, considering the stipulations and the gruesomeness of the photograph. The State argues that “the probative value of the evidence offered by the State was not outweighed by any prejudicial effect, especially where the evidence was necessary to how the victim was left after the accident.”
Section 90.403, Florida Statutes (2013), provides that “[rjelevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice .... ” The Florida Supreme Court “has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance.” Czubak v. State, 570 So.2d 925, 928 (Fla.1990); see also Smith v. State, 28 So.3d 838, 861 (Fla.2009) (“The test for admissibility of photographic evidence is relevancy rather than necessity.” (quoting Douglas v. State, 878 So,2d 1246, 1255 (Fla.2004))).
Here, the photograph of Hunter’s body lying in a pool of blood, covered in scrapes and wounds, with his pants down around his knees, was undoubtedly shocking in nature and, therefore, prejudicial. The trial court essentially acknowledged as much while overruling Ramroop’s objection to its admission. The precise issue for the trial judge, however, was not simply whether the photograph was prejudicial, but rather, whether its 'probative value was substantially outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (2013). This required the court to determine its probative value. We review the trial court’s decision to admit the photograph into evidence under the abuse of discretion standard of review. Smith, 28 So.3d at 861 (citing Davis v. State, 859 So.2d 465, 477 (Fla.2003)).
Because the State and Ramroop mutually stipulated to the location of the accident that caused Hunter’s death, the identity of the deceased, the cause of death, and the result of the traffic investigation, the probative value of the photograph was questionable in this case. Contrary to the State’s argument, it was unnecessary to show “how the victim was left after the accident” to prove the crime of first-degree murder. See Fla. Std. Jury Instr. (Crim.) 7.3. Additionally, whether the marks and scrapes on Hunter’s body might have been tire marks was also not determinative of any remaining issue. As a result, consid *591 ering the photograph was prejudicial and had limited, if any, probative value, we find that the trial court abused its discretion in admitting the photograph into evidence. See Czubak, 570 So.2d at 929; Dyken v. State, 89 So.2d 866, 866 (Fla.1956).
Having established that the admission of the photograph was error, we now address whether the error warrants a new trial. “The harmless error test [requires the State] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Here, considering the stipulations made by Ramroop and the totality of evidence presented at trial, we find that the State has shown beyond a reasonable doubt that the error did not contribute to the verdict. Accordingly, we find that the error in admitting the photograph was harmless and, thus, does not warrant a new trial.
III. The Jury’s Special Finding under Section 782.065, Florida Statutes (2013)
At trial, the jury was given the following special instruction, entitled “AGGRAVATION OF A FELONY VICTIM LAW ENFORCEMENT OFFICER”:
If you find that Gangapersad Ramroop committed the crime charged in count one of the information or any lesser included offense and you also find beyond a reasonable doubt that Christopher Brilliant [sic] was a law. enforcement officer in the lawful performance of a legal duty your finding should reflect that in the special verdict form If you find that Gangapersad Ramroop committed the crime charged in count one of the information or any lesser included offense, but you are not convinced beyond a reasonable doubt Christopher Brilliant [sic] was a law enforcement officer in the lawful performance of a legal duty y<¡>ur finding should reflect that in the special verdict form.
The jury found that Christopher Brillant was a law enforcement officer engaged in the lawful performance of a legal duty during Ramroop’s commission of the offense of attempted second-degree murder. Pursuant to section 782.065, Florida Statutes, the effect of the jury’s special finding ultimately removed the trial court’s discretion while sentencing Ramroop for attempted second-degree murder by increasing his maximum sentence for that count to mandatory life in prison without the eligibility of release. See § 782.065, Fla. Stat. (2013).
On appeal, Ramroop argues that “[i]n order to be convicted of attempting to murder a police officer engaged in the lawful performance of his duty, the State must allege and prove that the defendant knew the victim was a police officer.” Although the State acknowledges that the special jury instruction provided to the jury did not require it to find that Ramroop knew Officer Brillant was a law enforcement officer, the State argues, without much explication, that the court properly instructed the jury. The precise issue is whether section 782.065 requires the jury to find that Ramroop knew that the victim was a law enforcement officer before section 782.065 becomes operative.
Section 782.065, Florida Statutes, provides as follows:
Notwithstanding ss. 775.082, 775.0823, 782.04, 782.051, and chapter 921, a defendant shall be sentenced to life imprisonment without eligibility for release *592 upon findings by the trier of fact that, beyond a reasonable doubt:
(1) The defendant committed murder in the first degree in violation of s. 782.04(1) and a death sentence was not imposed; murder ip the second or third degree in violation of s. 782.04(2), (3), or (4); attempted murder in the first or second degree in violation of s. 782.04(l)(a) 1. or (2); or attempted felony murder in violation of s. 782.051; and
(2) The victim of any offense described in subsection (1) was a law enforcement officer, part-time law enforcement officer, auxiliary law enforcement officer, correctional officer, part-time correctional officer, auxiliary correctional officer, correctional probation officer, part-time correctional probation officer, or auxiliary correctional probation officer, as those terms are defined in s. 943.10, engaged in the lawful performance of a legal duty.
§ 782.065, Fla. Stat. (2013). Under the plain language canon, “[w]hen the statute is clear and unambiguous, courts will not look behind the statute’s plain language for legislative intent or resort to rules of statutory construction to ascertain intent. In such instance, the statute’s plain and ordinary meaning must control, unless this leads to an unreasonable result or a result clearly contrary to legislative intent.” Daniels v. Fla. Dep’t of Health, 898 So.2d 61, 64 (Fla.2005) (citation omitted).
However, unlike interpreting language that actually exists in a statute, the plain language canon is far less useful when interpreting intent from a lack of language, as here. The language in section 782.065 does not specify whether knowledge of the victim’s status as a law enforcement officer is required. See In re Standard, Jury Instructions in Criminal Cases—Report No. 2013-03, 146 So.3d 1110, 1114 (Fla.2014). As a result, at least for this issue, the statute is ambiguous, leading us to resort to other rules/canons of statutory construction to discern legislative intent. Diamond Aircraft Indus., Inc. v. Horowitch, 107 So.3d 362, 367 (Fla.2013) (citing Weber v. Dobbins, 616 So.2d 956, 958 (Fla.1993)). This entails examining the legislative history, prior case law, and other similar statutes, inter alia. See id.; State v. D.C., 114 So.3d 440, 441 n. 1 (Fla. 5th DCA 2013).
Looking beyond the plain language of the statute, we begin our analysis by reviewing the Florida Supreme Court’s earlier determination of whether section 784.07(3), Florida Statutes (1993), which, as discussed below, ultimately progressed to the statute at issue, section 782.065, required knowledge of the victim’s status as a law enforcement officer. In 1993, section 784.07 — entitled Assault or battery of law enforcement officers, firefighters, or other specified officers; reclassification of offenses. — provided in relevant part as follows:
(2) Whenever any person is charged with knowingly committing an assault or battery upon a law enforcement officer ... engaged in the lawful performance of his duties, the offense for which the person is charged shall be reclassified as follows:
[[Image here]]
(3) Notwithstanding the provisions of any other section, any person who is convicted of attempted murder of a law enforcement officer engaged in the lawful performance of his duty or who is convicted of attempted murder of a law enforcement officer when the motivation for such attempt was related, all or in part, to the lawful duties of the officer, shall be guilty of a life felony, punishable as provided in s. 775.0825.
*593 § 784.07(2X3), Fla. Start. (1993).[4] As drafted, knowledge of the victim’s status as a law enforcement officer was not expressly required as an element under subsection (3) to prove the attempted murder of a law enforcement officer. However, in Thompson v. State, 695 So.2d 691 (Fla.1997), the Florida Supreme Court addressed on appeal whether the trial court erred in denying the defendant’s requested jury instruction, which included knowledge of the victim’s status as a law enforcement officer as an element of attempted murder of a law enforcement officer under section 784.07(3), Florida Statutes (1993). 695 So.2d at 691. The court reversed the defendant’s conviction for attempted felony murder, holding that, notwithstanding the absence of language in the statute itself, “knowledge of the victim’s status as a law enforcement officer is an element of attempted murder of a law enforcement officer under subsection (3) of section 784.07, Florida Statutes (1993).” Id. at 692. The court provided four rationales for its holding.
First, the court stated that “[i]t is a settled principle of statutory construction that phrases within a statute are not to be read in isolation, but rather should be construed within the context of the entire section.” Id. (citing Roberts v. State, 685 So.2d 1277, 1279 (Fla.1996)). Applying this principle, the court' stated that “[i]t would be illogical and unreasonable to require that knowledge of the officer’s status is an element which must be proved to convict a defendant of battery under subsection (2) of this statute and at the same time not require proof of knowledge of the officer’s status to convict the defendant of attempting to shoot an officer under subsection (3).” Id.
Second, the court found that the language and application' of subsection (3) implicated a knowledge requirement because attempted murder of a law enforcement officer is a specific intent crime and a conviction for an attempted offense “has always required proof of the intent to commit the underlying crime,” at least with respect to specific intent crimes. Id. (quoting Amlotte v. State, 456 So.2d 448, 450 (Fla.1984) (Overton, J., dissenting)).
Third, the court found that because subsection (3) addresses two possible fact patterns, one of which implicitly requires a factual finding that the defendant had knowledge of the victim’s status, “it also would be illogical and unreasonable to require a factual finding that knowledge existed to convict under the second part of the sentence in subsection (3) and simultaneously not require a factual finding of knowledge under the first part.” Id. at 692-93.
Fourth, the court found that interpreting subsection (3) to not require knowledge of the victim’s status would lead to “unreasonable, harsh, or absurd consequences” because “attempted murder of a law enforcement officer is classified as a life felony punishable by a term of life or a term not exceeding forty years in prison, which is substantially greater than. the penalty for attempted first-degree murder, which is punishable by a maximum of thirty years in prison.” Id. at 693. According to the court, “in the absence of a clear intent to the contrary, the more substantial the penalty for the offense, the more incongruous it would be not to require *594 guilty knowledge.” Id. (citing Chicone v. State, 684 So.2d 736, 742 (Fla.1996)). Moreover, “where criminal statutes are susceptible to differing constructions, they must be construed in favor of the accused.” Id. (citing Scales v. State, 603 So.2d 504, 505 (Fla.1992)).
As noted by the dissent in Thompson, in 1995, the Legislature removed subsection (3) from section 784.07 and reenacted it in section 775.0823, the Law Enforcement Protection Act (“LEPA”).[5] Id. at 694 (Wells, J., dissenting). Section 775.0823, entitled “Violent offenses committed against law enforcement officers, correctional officers, state attorneys, assistant state attorneys, justices, or judges,” purportedly provided for “an increase and certainty of penalty for any person convicted of a violent offense against” those named officials where the offense arose out of or in the scope of the official’s duties. § 775.0823, Fla. Stat. (1995). Specifically, in 1995, the Legislature added the crime of attempt for all murder offenses listed in the prior version (i.e., first-, second-, and third-degree murder). For example, the 1995 version added the following language:
(2) For attempted murder in the first degree as described in s. 782.04(1), a sentence pursuant to the sentencing guidelines.
[[Image here]]
(4) For attempted murder in the second degree as described in s. 782.04(2) and (3), a sentence pursuant to the sentencing guidelines.
Id. For all other offenses listed in the statute, the language remained unchanged. If the defendant was convicted of first-degree murder of a law enforcement officer, for example, and a sentence of death was not imposed, the defendant was required to be sentenced to life in prison “without eligibility for release.” Id. For all other pertinent offenses, the defendant was required to be sentenced “pursuant to the sentencing guidelines.” Id.
In essence, then, the Legislature transplanted the subsection at issue in Thompson, section 784.07(3), into section 775.0823, and increased the penalty for its violation. With the exception of the addition of attempted felony murder and the replacement of the language “pursuant to the sentencing guidelines” with the language “pursuant to s. 775.082, s. 775.083, or s. 775.084,” section 775.0823 remains unchanged to date.[6] See § 775.0823, Fla. Stat. (2013).
In 2008, the Legislature enacted section 782.065, Florida Statutes. The preamble to the Council Substitute for House Bill that proposed the later-enacted statute states that it is “[a]n act relating to murder of law enforcement officers; creating 782.065, F.S.; providing a minimum mandatory sentence for certain offenses; providing an effective date.” Fla. HB 321 (2008). The intended effect of the proposed bill was to “supersede” penalties in section 775.0823, Florida Statutes, for all murder offenses listed in LEPA that were committed against law enforcement officers; however, the effect was not to supersede non-murder offenses committed against law enforcement officers or any other offenses in LEPA that were committed against correctional officers, state attorneys, assistant state attorneys, justices, or judges. Fla. S. Comm, on Crim. Just., CS for SB 1064 (2008) Staff Analysis (Apr. 7, 2008); see also Fla. H.R. Comm, on Homeland Sec. & Pub. Saf., HB 321 (2008) Staff Analysis (Mar. 18, 2008).
*595 However, the legislative history of section 782.065 does not provide any indication as to whether the Legislature intended to preclude knowledge of the victim’s status as a prerequisite to the enhanced penalty. In other words, although knowledge is not mentioned in the statute, this does not equate to the conclusion that knowledge of the victim’s status is not required.[7] Furthermore, there is nothing to indicate that the Legislature considered a knowledge requirement and then rejected it. Therefore, we must look to other sources to determine whether this statute required the jury to be instructed on whether Ramroop knew the victim was a law enforcement officer.
While no case has squarely addressed this issue, we find that the reasoning provided in Thompson is applicable to the instant appeal. Specifically, we find the court’s second and fourth rationales to be instructive. The court’s finding that the language and application of section 784.07(3) implicated a knowledge requirement because attempted murder of a law enforcement officer is a specific intent crime may appear, at first blush, to not apply to the facts of this case because attempted second-degree murder is a general intent crime. See State v. Brady, 745 So.2d 954, 957 (Fla.1999) (“The offense of attempted second-degree murder does not require proof of the specific intent to commit the underlying act (i.e., murder).” (citing Gentry v. State, 437 So.2d 1097 (Fla.1983))). However, because section 782.065 should be construed within the context of the entire section, Thompson, 695 So.2d at 692 (citing Roberts, 685 So.2d at 1279), and it provides an across-the-board penalty enhancement for all murder offenses committed against a law enforcement officer, including attempted murder of a law enforcement officer, which is a specific intent crime, this implies that section 782.065 requires knowledge of the victim’s status as a law enforcement officer in all circumstances. Like former section 784.07(3), section 782.065 does not distinguish between specific intent crimes and general intent crimes. Therefore, knowing that the specific intent crime in section 782.065 implicitly requires knowledge of the victim’s status, to use the words of the Florida Supreme Court, it “would be illogical and unreasonable to require a factual finding that knowledge existed to convict under [one part]” but not the other. See Thompson, 695 So.2d at 692-93.
In addition, we find the substantial enhancement in penalty under section 782.065 to be meaningful. Normally, when a defendant is convicted of attempted second-degree murder, excluding other enhancements, the maximum possible sentence is fifteen years in prison. §§ 775.082(3)(c), 777.04(4)(c), 782.04(2), Fla. Stat. (2013). But under section 782.065, when a defendant is convicted of attempted second-degree murder and the jury also finds beyond a reasonable doubt that the victim was a law enforcement officer engaged in the lawful performance of a legal duty, the sentence dramatically increases to “life imprisonment without eligibility for release.” § 782.065, Fla. Stat. (2013). This difference between penalties is even greater than the difference between the penalties applicable in Thompson, where the court found that, absent *596 some clear intent to the contrary, it would be incongruous not to require “guilty knowledge.” See 695 So.2d at 698. Thus, the incongruity rationale provided in Thompson strongly suggests that section 782.065 requires guilty knowledge because the Legislature did not clearly provide that knowledge of the victim’s status is not required. See id.
A comparison to other similar statutes also indicates that it would be incongruous for section 782.065 not to require knowledge of the victim’s status. Under the principle in pari materia, similar statutes should be interpreted similarly unless legislative history or purpose suggests material differences. See, e.g., Fla. Dep’t of Envtl. Prot. v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1265-66 (Fla.2008). In many other reclassification statutes where the penalty is increased based on the status of the victim, the Legislature explicitly included knowledge of the victim’s status as a requirement. For example, as discussed in Thompson, to prove the enhanced crime of battery on a law enforcement officer, the State must show that the defendant knew the victim was a law enforcement officer. See Thompson, 695 So.2d at 693; see also Fla. Std. Jury Instr. (Crim) 8.11. In another statute, the Legislature transformed a simple battery into aggravated battery “if the person who was the victim of the battery was pregnant at the time of the offense and the offender knew or should have known that the victim was pregnant.” § 784.045(l)(b), Fla. Stat. (2013). In a third statute, the degree of the crime increases by one (e.g., second-degree felony to first-degree felony) “[wjhenever a person is charged with committing an assault or aggravated assault or a battery or aggravated battery upon a staff member of a sexually violent predators detention or commitment facility ... while the staff member is engaged in the lawful performance of his or her duties and when the person committing the offense knows or has reason to know the identity or employment of the victim....” § 784.074(1), Fla. Stat. (2013) (emphasis added). The same is true when the victim is a specified official or employee under section 784.081 or a code inspector under section 784.083. §§ 784.081(2), 784.083, Fla. Stat. (2013). In sum, many other statutes that are similar to section 782.065 require knowledge of the victim’s status; we find that section 782.065 should be interpreted similarly.[8] See ContractPoint, 986 So.2d at 1265-66.
Moreover, if the Legislature intended to make knowledge of the victim’s status not required under section 782.065, it could have included a provision stating as much. To illustrate, the earlier reclassification statute governing assault or battery on persons 65 years of age or older — section 784.08 — was previously interpreted by courts as requiring knowledge of the victim’s status, although knowledge of the victim’s status was not expressly required in the statute. See Cochran v. State, 622 So.2d 166, 167 (Fla. 2d DCA 1993). The Legislature then revised the statute to make clear that the penalty shall increase by one degree “regardless of whether [the defendant] knows or has reason to know the age of the victim.” See § 784.08(2), Fla. Stat. (2013); id. Relatedly, the Flori *597 da Supreme Court in Thompson interpreted section 784.07(8) as requiring knowledge even though subsection (3) did not specify whether knowledge was required. 695 So.2d at 698. Section 784.07(3) was subsequently removed and reenacted in section 782.0823, and 782.065 was enacted in 2008 to “supersede” section 782.0823. Therefore, because the Legislature was presumptively aware of Thompson when it drafted section 782.065, it could have explicitly stated that knowledge of the victim’s status is not required under section 782.065 if that is what it intended.
Lastly, but perhaps most importantly, because the statute is ambiguous as to this issue, this court must apply the rule of lenity. As stated in section 775.021, “The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.” § 775.021(1), Fla. Stat. (2013). Accordingly, because it is unclear whether section 782.065 requires knowledge of the victim’s status, this court is obligated by the Legislature to interpret the statute as requiring knowledge. See Thompson, 695 So.2d at 693.
In sum, we hold that section 782.065 requires knowledge of the victim’s status as a law enforcement officer. The reasoning provided in Thompson suggests that it would be incongruous for the statute to substantially increase the penalty without requiring knowledge. Thompson also suggests .that it would be unreasonable or illogical for the statute to implicitly require knowledge for the specific intent crime within the statute, but not for others. Additionally, although the legislative history of section 782.065 provides little guidance, the fact that many other reclassification statutes require knowledge of the victim’s status suggests that knowledge is required in section 782.065. Lastly, because the statute is ambiguous, this court must resolve the ambiguity in favor of the accused, which requires this court to hold that knowledge is required. Therefore, we find that the trial court’s imposition of a life sentence pursuant to section 782.065 was fundamental error because the jury did not find that Ramroop had knowledge that the victim was a law enforcement officer because it was not instructed to determine this issue. Accordingly, we vacate the jury’s special finding relevant to this issue.
The next issue we must address is the effect of vacating the jury’s special finding under section 782.065 on Ram-roop’s convictions and sentences. Ram-roop argues that knowledge of the victim’s status is an essential element of the offense of second-degree murder of a law enforcement officer, requiring reversal of his conviction and sentence for that offense. His argument assumes that section 782.065 is a substantive offense. To address Ramroop’s argument, we must determine whether section 782.065 is a substantive offense, an enhancement provision, or a reclassification statute. The Florida Supreme Court’s historical consideration of section 784.07 is again helpful to our analysis.
In Thompson, the court expressly declined to decide whether 784.07(3) was a substantive offense, as previously “assumed” by this court in Grinage v. State, 641 So.2d 1362, 1365 (Fla. 5th DCA 1994), approved, 656 So.2d. 457 (Fla.1995). See Thompson, 695 So.2d at 693; Mills v. State, 822 So.2d 1284, 1287 (Fla.2002). The court stated, “While the jury’s status as fact finder implicates the notion that a substantive offense has been created under the statute, we need not reach this question to resolve the issue here.” Thompson, 695 So.2d at 693.
*598 Subsequently, in Merritt v. State, 712 So.2d 384 (Fla.1998), the court stated that “[s]ection 784.07, Florida Statutes (1995), is an enhancement statute rather than a statute creating and defining any criminal offense.” Id. at 385. In Merritt, the court found that neither attempted battery nor attempted aggravated assault could be reclassified under section 784.07(2) because that statute did not include those offenses. Id. Accordingly, the court remanded with directions to resentence Merritt for the offense of attempted battery “without felony reclassification based upon section 784.07(2)(b), Florida Statutes (1995) (battery of a law enforcement officer).” Id.
Four years later, in Mills, the court reconsidered the statute a second time, concluding that “section 784.07 operates as a reclassification statute,” rather than an enhancement statute. 822 So.2d at 1287. The court explained its reasoning as follows:
Thus, although in Merritt we characterized the statute as an “enhancement statute” to emphasize that it resulted in greater penalties for already-enumerated offenses which qualified under the statute, rather than itself creating new offenses, there is a qualitative difference between a statute which reclassifies enumerated offenses committed against law enforcement officers and enhancement statutes such as the habitual offender statute, “which cut across some or all criminal statutes.”
Id. (quoting State v. Brown, 476 So.2d 660, 662 (Fla.1985)).[9] As such, the court went on to find that an offense reclassified as a felony pursuant to section 784.07 could qualify as a felony offense for purposes of habitual felony offender status without violating double jeopardy. See id. at 1287-89.
In this case, we find that section 782.065, Florida Statutes, is a reclassification statute. Pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d. 435 (2000), and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), any fact that elevates the defendant’s maximum possible sentence, other than a prior conviction, must be found beyond a reasonable doubt by the jury, rather than by the judge.[10] Galindez v. State, 955 So.2d 517, 519 (Fla.2007). Here, section 782.065 can increase a defendant’s sentence beyond the maximum possible sentence of the substantive crime and is only applied following a jury’s finding that the defendant violated a particular subsection of section 782.04 or 782.051. As such, the statute, in and of itself, is not a substantive crime.
Further, based on the Florida Supreme Court’s reasoning in Mills, section 782.065 is not an enhancement statute. Unlike the habitual felony offender statute, the prison releasee reoffender statute, and the mandatory minimum sentence for possession of a firearm statute, all of which are enhancement statutes, section 782.065 does not “cut across some or all criminal statutes.” See Mills, 822 So.2d at 1287 (quoting Brown, 476 So.2d at 662). Rather, like section 784.07, section 782.065 “reclassifies enumerated offenses committed against law enforcement officer[s].” See id. Specifically, as indicated above, section 782.065 only applies following certain violations of *599 the (attempted) homicide offenses in 782.04 and 782.051 and operates solely to reclassify such offenses committed against law enforcement officers as mandatory life felonies.
Here, based on the jury’s special finding that Officer Brillant was an officer engaged in the lawful execution of his duties at the time of the attempted second-degree murder, Ramroop was sentenced pursuant to section 782.065 to life in prison without the eligibility of release. However, because the jury was not instructed to determine whether Ramroop had knowledge of Officer Brillant’s status as a law enforcement officer, his sentence for attempted second-degree murder is erroneous. Nevertheless, we do not vacate the underlying conviction. Rather, because section 782.065 operates as a reclassification statute, we remand solely for resentencing as to attempted second-degree murder without reclassification under section 782.065. See Merritt, 712 So.2d at 385; cf. Mashburn v. State, 745 So.2d 458, 454 (Fla. 5th DCA 1999) (“Mashburn is correct that he should not have been adjudicated and sentenced for robbery with a firearm. On remand, he is to be resentenced for the offense of robbery with a weapon.”); Palmer v. State, 692 So.2d 974, 975 (Fla. 5th DCA 1997) (reversing and remanding for resentencing where the trial court sentenced the defendant “to a minimum mandatory eight-year prison term on the basis that he utilized a semi-automatic weapon when the information charged and the jury’s verdict merely found that he had used a ‘firearm’ ”). Further, because neither the first-degree murder nor the discharge of a firearm convictions required knowledge of Officer Brillant’s status, these convictions and sentences are unaffected by our ruling.[11]
Accordingly, we reverse and remand for resentencing with respect to Ramroop’s conviction for attempted second-degree murder. As to all convictions and all other sentences, we affirm.
AFFIRMED in part; REVERSED in part; and REMANDED for resentencing.
SAWAYA and EDWARDS, JJ., concur.

. The issue of whether Ramroop shot at Officer Brillant in the course of the pursuit would impact the jury's finding not only as to whether Ramroop attempted to murder Officer Bril-lant, but also as to whether Ramroop was engaged in the perpetration of a felony sufficient to satisfy section 782.04(l)(a)2., Florida Statutes (2013), pertaining to the first-degree murder of Hunter.

. To "ridicule” is "to laugh at and make jokes about (someone or something) in a cruel or harsh way: to make fun of (someone or something).” Merriam Webster's Dictionary, http://www.merriam-webster.com/dictionary/ ridicule (last visited Aug. 7, 2015).

. Defense counsel objected to this line of argument as a "misstatement” of her' argument. The court responded, ‘-The jury will remember whatever was said by counsel and I'll leave it up to them.”

. Section 775.0825 provided, “Any person convicted of attempted murder of a law enforcement officer as provided in s.784.07(3) shall be required to serve no less than 25 years before becoming eligible for parole.” § 775.0825, Fla. Stat. (1993). Sections 784.07(3) and 775.0825 applied only to first-degree murder. State v. Iacovone, 660 So.2d 1371, 1374 (Fla.1995). Neither (sub)section exists today.

. The Legislature did not alter subsection (2).

. Section 921.0024, Florida Statutes, currently provides for a sentencing multiplier when the primary offense is a violation of LEPA.

. By way of analogy, ‘‘[a]t common law, all crimes consisted of both an act or omission coupled with a requisite guilty knowledge or mens rea.” State v. Giorgetti, 868 So.2d 512, 515 (Fla.2004) (citing United States v. Balint, 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922)). “Subsequently, ... this rule was followed with regard to statutorily defined crimes, even if the statute did not expressly include a knowledge requirement.” Id. (citing Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)).

. Further, interpreting section 782.065 to require knowledge of the victim’s status as a law enforcement officer does not contravene the legislative history and purpose of the statute. Notwithstanding the relatively limited legislative history of the statute, it appears that its purpose, like section 784.07, is to discourage lethal attacks against law enforcement officers Cf. Iacovone, 660 So.2d at 1373-74. However, the statute, as worded, has no specific deterrent effect on individuals who do not know that their potential victim is a law enforcement officer.

. For a discussion of the Florida Supreme Court’s classification and reclassification of section 784.07, see State v. Barnum, 921 So.2d 513, 518 (Fla.2005), as revised on denial ofreh'g, (Feb. 9, 2006).

. Both Blakely and Apprendi dealt with enhancement or reclassification statutes, rather than solely substantive crimes. See Blakely, 542 U.S. at 298, 124 S.Ct. 2531 ("deliberate cruelty” enhancement); Apprendi, 530 U.S. at 471, 120 S.Ct. 2348 (hate-crime enhancement).

. With respect to Ramroop’s first-degree murder conviction, Ramroop received a mandatory life sentence. With respect to the discharge of a firearm conviction, we find that Ramroop’s total sentence points on his Criminal Punishment Scoresheet is not affected by vacating the jury's special finding under section 782.065 because the severity level for that offense is not affected by whether the victim is a law enforcement officer. See § 921.0022, Fla. Stat. (2013).